**WRONA GORDON & DUBOIS, P.C.**
Scott A. DuBois (#7510)
Joseph M. Stultz (#12251)
1745 Sidewinder Drive
Park City, Utah 84060
Telephone:  (435) 649-2525
Dubois@wgdlawfirm.com
Stultz@wgdlawlfirm.com
*Attorneys for Plaintiffs*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **JAMES SWEET,** an individual, and **ASTANZA DESIGN LLC,** a Colorado limited liability company,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>**CORPORATION OF THE PRESIDING BISHOP OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS,** a Utah corporation,<br><br>　　　　Defendant. | **COMPLAINT & JURY DEMAND**<br><br>Case No. _____<br><br>Judge _____ |

Plaintiffs James Sweet and Astanza Design LLC (collectively "Plaintiffs"), by and through their counsel of record, Wrona Gordon & DuBois, P.C., hereby complain and allege against the Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints as follows:

## PARTIES

1.     Plaintiff James Sweet ("Mr. Sweet") is an individual and resident of the State of Colorado.

2.     Plaintiff Astanza Design LLC ("Astanza") is a limited liability company located in the State of Colorado.

3.     Defendant Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints (the "LDS Church" or "Defendant") is a corporation headquartered in the State of Utah.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 due to the complete diversity of citizenship between the Plaintiffs and Defendant, with the amount in controversy, exclusive of interest and costs, exceeding $75,000.00.

5.     Venue is proper with the above-entitled Court pursuant to 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

6.     Mr. Sweet is the sole owner of Astanza, an international, strategic interior design and global sourcing firm specializing in commercial projects worldwide.

7.     Through Astanza, Mr. Sweet has represented and represents a number of furniture makers and suppliers worldwide and he performs work on behalf of these manufacturers and buyers of their products.

8.      In December 2008, Mr. Sweet was contacted by phone by Gloria Kummer ("Ms. Kummer"), a senior interior designer, formerly employed at the Utah design firm VCBO Architecture ("VCBO").  Ms. Kummer's employment with VCBO ended in 2015.

9.      Ms. Kummer contacted Mr. Sweet because Mr. Sweet had previously sent Ms. Kummer an Italian-produced wood sample of a "console" top.

10.     During the December 2008 phone call, Ms. Kummer informed Mr. Sweet that VCBO was awarded the design project for the LDS Church's Rome temple, and that Ms. Kummer wanted to possibly source furniture from one or more Italian suppliers through Mr. Sweet.

11.     This conversation led to a series of contacts and events whereby Mr. Sweet soon thereafter introduced Ms. Kummer to Francesco Molon, an Italian furniture manufacturer of fine temple quality furniture.  Francesco Molon is the trade name of an Italian furniture manufacturer, Giemme Stile, S.P.A, which also operates in the United States from a High Point, North Carolina showroom under a legal entity known as Giemme USA LLC (collectively, "Giemme").

12.     Prior to this introduction, neither Ms. Kummer nor known parties at the LDS Church had any knowledge of, communications with, or prior business dealings with Giemme, either in Italy or the United States.  Likewise, neither staff nor employees of Giemme had any knowledge of, communications with, or business dealings with the LDS Church or its outside designer firms (hereinafter "Design Agents").

13.     VCBO had other temple projects for which it was seeking furniture for the LDS Church, and VCBO began to regularly discuss with and engage Mr. Sweet regarding the furniture manufacturers he represented.

14.     This led to Mr. Sweet's first involvement with the LDS Church for the San Salvador temple and ancillary housing.

15.     Mr. Sweet provided liaison services with two Honduran furniture manufacturers, Caoba de Honduras and Artesanos, in connection with the LDS Church's San Salvador temple.

16.     Mr. Sweet had written representation agreements with both Honduran furniture manufacturers specifically and exclusively regarding dealings with the LDS Church.

17.     In particular, Caoba de Honduras signed a Supplier/Reseller Agreement with Astanza with an effective date of January 1, 2009 (hereinafter, the "Supplier/Reseller Agreement" or the "Caoba Supplier/Reseller Agreement") (attached as **Exhibit 1**).

18.     The Supplier/Reseller Agreement obligated Caoba de Honduras to deal with the LDS Church through Astanza and prohibited Caoba de Honduras from dealing directly with the LDS Church.  *See id.*

19.     The Supplier/Reseller Agreement had a duration of 10 years, but did provide either party with the ability to terminate the Supplier/Reseller Agreement on December 31, 3015 if a party gave ninety days written advance notice.  *See id.*

20.     As was the case with Giemme, neither Ms. Kummer nor any known staff or other Design Agents had any knowledge of, communications with, or business dealings with Caoba de Honduras or Artesanos prior to Mr. Sweet's introduction.

21.     Mr. Sweet made trips to Utah multiple times starting in 2009 to introduce his Italian manufacturer, Giemme, to designers and purchasing managers within the LDS Church.

22.     Mr. Sweet made similar trips with the owner of Caoba de Honduras.

23.     From 2009 to the present, as the sole and exclusive representative for these furniture manufacturers, Mr. Sweet promoted and coordinated the sale and delivery of furniture to over 50 LDS Church temples throughout the world.

24.     In 2009, a former Giemme employee responsible for US business development, Maurizio Molinari, flew to Salt Lake City at Mr. Sweet's request to meet with Mr. Sweet for appointments set with six (6) Design Agents and LDS Church Purchasing Managers and Designers.

25.     Mr. Sweet, acting as the representative of these manufacturers, including Giemme, promoted the products, delivered samples, provided quotes, took orders, and coordinated the payment and delivery of products with LDS Church purchasing managers, LDS Church employed designers, most Design Agents, and LDS Church coordinating support staff.

26.     In order to protect the business relationship between Astanza and Giemme and to ensure that Astanza was compensated for its work in securing orders and ensuring delivery of Giemme's products, Astanza and Giemme entered into a formal written representation agreement (hereinafter, the "Representation Agreement," or the "Giemme Representation Agreement") (attached as **Exhibit 2**).

27.     The Giemme Representation Agreement was negotiated in 2010 and signed on February 21, 2011, after Giemme hired a new United States National Sales Manager, Federico Contigiani ("Mr. Contigiani").

28.     Among other things, the Representation Agreement designated Astanza as the exclusive, worldwide sales representative for all Giemme products and services sold or distributed to the LDS Church.  *See* Representation Agreement (Ex. 2).

29.     In addition, the Representation Agreement prohibited any direct communication between Giemme and the LDS Church that violated the intent of the Representation Agreement. All price quotes, purchase orders, and invoices were required to be channeled through Astanza. *See id.*

30.     From 2009 through late 2012, the LDS Church purchased products from Giemme and Caoba de Honduras through Astanza.

31.     From 2009 through late 2012, the LDS Church also requested all price quotes, submitted all purchase orders, and conducted all communications for temple and other LDS Church projects using Giemme and Caoba de Honduras furniture through Astanza.

32.     During this period, Mr. Sweet was actively involved multiple times each day with the LDS Church, the LDS Church's agents and representatives, and the  Design Agents working for the LDS Church, and worked diligently to provide quotes, exchange design documents, and to channel purchase orders, acknowledgements, and invoices to the LDS Church.

33.     Astanza also coordinated logistics, warranty issues and all other matters as the exclusive and sole representative between the LDS Church and its agents and Giemme and Caoba de Honduras on four to eight temple projects at a time.

34.     From 2009 through late 2012, all parties honored the Representation Agreement and Supplier/Reseller Agreement and were served well by Astanza and Mr. Sweet.

35.     Prior to that, the parties honored the industry standard and practice, which dictated that the LDS Church would not "cut out" Giemme's and Caoba de Honduras' designated representative, Mr. Sweet, by insisting that Giemme and Caoba de Honduras deal directly with the LDS Church or lose the Church's business.

36.     In the summer of 2011, Mr. Sweet invited Mr. Contigiani to fly to Salt Lake City and meet with various Design Agents, purchasing managers and LDS church designers.  One important meeting was a luncheon that Mr. Sweet arranged with the lead LDS church designer for the Rome temple, Bruce Edwards ("Mr. Edwards"), and Ms. Kummer of VCBO, the assigned Design Agent for the Rome temple project.  During this meeting and subsequent conversations and exchanges, Mr. Sweet was informed that Giemme was selected as one of the primary suppliers of temple and other furnishings for the Rome temple.

37.     In late 2011, Clay Chugg ("Mr. Chugg"), then Manager of Furnishings, Purchasing Division for the LDS Church, and a close contact to Mr. Sweet, began telling Mr. Sweet in emails and phone calls that Astanza suppliers were unlikely to receive much if any business with the LDS Church unless each would comply with a payment policy whereby the

LDS Church would pay no deposit and would pay 30 days after delivery of the furniture (Net 30) (combined, the "Payment Policy").

38.     Mr. Chugg also requested that the LDS Church designers and purchasing managers have direct communications with the suppliers – a request that violated the Representation Agreement.

39.     During this time, VCBO architecture began in earnest to specify Giemme furniture for most of the rooms in the Rome temple.

40.     These discussions between Mr. Chugg and Mr. Sweet became more frequent and intense over the next six months with Mr. Chugg stating that it was the policy of the LDS Church and an ardent request of his superiors that all suppliers that Mr. Sweet represented comply with the LDS Church's new Payment Policy and its new policy of the LDS Church having direct communications with suppliers.   These policies were often referred to together as a "Gold Star Vendor" status.

41.     Mr. Sweet flew to Salt Lake City in the first quarter of 2012 for a breakfast meeting with Mr. Chugg regarding the LDS Church's new Payment Policy and its request for direct communications between the LDS Church and Giemme.

42.     In early 2012, Dave Finlinson ("Mr. Finlinson"), a global strategic business manager of the LDS Church, was introduced through emails to Mr. Sweet.  After that time, Mr. Chugg had little if any involvement with Mr. Sweet or his furniture suppliers.

43.     Mr. Finlinson's involvement became more direct and aggressive with Mr. Contigiani beginning in April, 2012, at the same time that VCBO and Mr. Edwards were

diligently working on finalizing furniture selections, prices, and budgets with Giemme for the Rome temple.

44.     Purchase orders for the Rome temple were pending and the LDS Church insisted that a new arrangement be established between the LDS church and Giemme – an arrangement to alter the pricing, the terms, the communications, and the involvement of Mr. Sweet.

45.     In early April 2012, Mr. Contigiani, the United States National Sales Manager for Giemme, sent a letter to Mr. Chugg and Mr. Finlinson responding to a comment made by one of the senior designers for the LDS Church in a conference call.

46.     Mr. Contigiani stated in his letter, in essence, that Giemme felt that the existing 50-50 deposit and payment prior to shipment was agreed to and fair and should be honored, yet was willing to listen to all proposals.

47.     Mr. Contigiani also confirmed and reinforced that Mr. Sweet was the exclusive representative of Giemme in all matters with the LDS Church.

48.     In mid-April 2012, Roberto Molon, Managing Director of Giemme, and Mr. Contigiani flew into Salt Lake City from Italy to host, with Mr. Sweet, a luncheon for three dozen designers and purchasing employees of the LDS Church at the Grand America Hotel.

49.     One week later, on or about April 19, 2012, three people representing the LDS Church flew to Milan, Italy for Europe's largest furniture trade fair, at which Giemme exhibited, and then to the Giemme factory in Romano d'Ezzelino, Italy to further seek to demand better terms and conditions with Giemme.

50.     The LDS Church representatives included Mr. Edwards, a senior church designer who also was responsible for interior furnishings for the Rome temple, Mr. Finlinson, Global Strategic Relationship Manager for the LDS Church, and Ms. Kummer of VCBO architecture, the appointed outside design lead for the Rome temple.

51.     To ensure that the LDS Church was formally on notice of Mr. Sweet's contractual relationship with Giemme and Caoba de Honduras, and to ensure that there was no attempt by the LDS Church to induce Giemme to breach its Representation Agreement with Astanza or to induce Caoba de Honduras to breach its Supplier/Reseller Agreement with Astanza, Mr. Sweet sent an email on July 23, 2012 to Mr. Chugg and Mr. Finlinson with select pages of the Representation Agreement between Astanza and Giemme and the Supplier/Reseller Agreement between Astanza and Caoba de Honduras.  *See* **Exhibit 3**, attached hereto.

52.     Specifically, Mr. Sweet stated:  "Just for the record, I have attached Select Pages from Astanza's Supplier-Reseller Agreements with Francesco Molon . . . and Caoba de Honduras.  Please refer to Paragraph 2(D), regarding communications.  I support the notion of open communication as long as no party is trying to violate the intent and provisions of the agreement or interfere with a known and established business relationship."  *See id.*

53.     Despite the email from Mr. Sweet to Mr. Chugg and Mr. Finlinson, Mr. Finlinson continued to insist that Giemme move to a "Gold Star Vendor" status, which included "cutting out" Astanza as a representative of Giemme so that the LDS Church would get lower, direct pricing from Giemme.

54.     Indeed, in a November 2012 email to Mr. Contigiani, Mr. Finlinson stated that unless Giemme accepted the LDS Church's terms, which included eliminating Mr. Sweet as Giemme's representative for LDS Church purchases, the LDS Church would eliminate Giemme from its approved vendor list and Mr. Edwards would not even consider Giemme furniture for the Rome Temple.

55.     The LDS Church knew that it had a great deal of influence over Giemme because the LDS Church promised to purchase a substantial amount of Francesco Molon furniture for the Rome Temple and for other projects.

56.     Although Giemme resisted "cutting out" Astanza, it ultimately succumbed to Mr. Finlinson's economic threats and pressure because Giemme's owner, Roberto Molon, and its National Sales Manager, Federico Contigiani understood that the LDS Church would not buy from Giemme unless Giemme agreed to the new Payment Policy and agreed to conduct direct communications with the LDS Church without the involvement of Astanza.

57.     On December 21, 2012, Mr. Finlinson followed up with a signed Letter Agreement with nine (9) bullet points of specified terms between Francesco Molon/Giemme Stile S.P.A and the LDS Church.

58.     Point number five (5) called for direct communication with the factory in Italy, and point number seven (7) stated, "Seller will eliminate the transactional involvement of sales reps." *See id.*

59.     This Letter Agreement coerced and forced Giemme to breach its contract with Astanza by demanding that Giemme eliminate the involvement of sales representatives like Mr. Sweet of Astanza.

60.     In other words, the LDS Church's threat to discontinue all purchases from Giemme unless it accepted the terms of the Letter Agreement coerced Giemme into breaching its Representation Agreement with Astanza.

61.     After Giemme agreed to comply with the terms of the Letter Agreement, the notice of the elimination of Mr. Sweet and Astanza from transactions with Giemme was immediately conveyed to employees and Design Agents of the LDS Church.

62.     Mr. Sweet immediately stopped receiving emails and calls from designers and purchasing managers who either worked directly for the LDS Church or were agents for the LDS Church.

63.     Communications for multiple temple projects where Astanza had been the only point of contact for and with Giemme were immediately rechanneled directly to Mr. Contigiani and a customer service representative in Giemme's North Carolina office.

64.     Mr. Sweet's phone calls and emails were not returned by the LDS Church designers and purchasing managers.

65.     Phone calls and emails made by Mr. Sweet to outside designers on current LDS Church temple projects such as Payson (Utah), Rome, Tijuana, and multiple others were not returned.

66.     Giemme sales and customer service people no longer called or copied Mr. Sweet on communications with the LDS Church, its agents, or its outside design firms.

67.     Despite Mr. Sweet's attempts to fulfill the terms of his Representation Agreement with Giemme, he was effectively removed and his contract breached.

68.     In 2013, Caoba de Honduras started dealing directly with the LDS Church, VCBO, and possibly other Design Agents, in spite of Mr. Sweet's July 23, 2012 email to Mr. Chugg and Mr. Finlinson.

69.     On information and belief, this direct dealing started for the same reasons discussed above, that the LDS Church began to require its suppliers to cut its resellers out or lose the LDS Church's business.

70.     The LDS Church knew that Caoba de Honduras had an exclusive Reseller Agreement with Astanza that prevented it from dealing directly with the LDS Church, just as Giemme had such an agreement with Astanza.

71.     Nonetheless, the LDS Church through its Design Agents practiced a new policy of dealing directly with Caoba de Honduras and not through Mr. Sweet.

72.     As a result of the LDS Church's economic pressure, Caoba de Honduras communicated directly with the LDS Church, and did not pay Astanza the commission it was due under the Supplier/Reseller Agreement for the sales to the LDS Church.

73.     Caoba de Honduras terminated the Supplier/Reseller Agreement with Astanza effective December 31, 2015 after the LDS Church, VCBO, and other Design Agents began

communicating directly with Caoba de Honduras without the knowledge or involvement of Astanza.

74.     Caoba de Honduras never expressed any dissatisfaction with the Supplier/Reseller Agreement with Astanza or mentioned that it would seek to terminate the Agreement Supplier/Reseller Agreement effective December 31, 2015 until this communication.

75.     The LDS Church's threat to terminate its business with Caoba de Honduras caused Caoba de Honduras to terminate its Supplier/Reseller Agreement with Astanza.

76.     The industry standard for large purchasers, such as the LDS Church, is to recognize the value and the services provided by manufacturer's representatives and independent brokers and to honor an exclusive representative (or broker) agreement and not to demand that a manufacturer cut out the representative or broker in a transparent move to obtain better terms from the manufacturer.

77.     The industry standard recognizes that tens of millions of manufacturer's representatives, like Astanza, who are important not only in the furniture industry, but in virtually every industry worldwide, whether selling pipes, clothing, auto parts, office supplies, food items, computers, or residential or commercial real estate, are entitled to reasonable compensation for the considerable time, effort, expertise, and resources that these representatives, brokers, and agents invest in business development, the promotion of products and services, and the creation of networks to enable buyers and sellers to connect.

78.     This industry standard exists because these manufacturer's representatives, brokers, and agents must have the confidence, comfort, and financial security of knowing that their legal and moral rights are honored and protected.

79.     Dozens of industry associations strive to promote, defend, and protect these vital manufacturer and representative/broker/agent relationships in multiple industries.   National associations with thousands of members include:   (i) the Association of Independent Manufacturers' Representatives, Inc, (AIM/R), (ii) the Manufacturers' Agents Association for the Foodservice Industry (MAFSI), (iii) the National Association of General Merchandise Representatives (NAGMR), (iv) United Association Manufacturer's Representatives (UAMR), and (vi) International Home Furnishings Representatives Association (IHFRA).

80.     Further, it is recognized as an industry standard and custom, by both buyers and manufacturers/suppliers, that representatives, brokers, and agents protect their investments of time and resources by securing exclusive agreements with manufacturers, which in this case was the Representation Agreement between Giemme and Astanza, and the Supplier/Reseller Agreement between Caoba de Honduras and Astanza.

81.     The industry standard is that large purchasers, including governmental entities such as the U.S. Department of Defense, school districts, or the State of Utah or California; non-profits such as health agencies, certain hospitals and churches; or-for profit businesses such as General Motors, Costco, and Staples are aware of, benefit from, and honor exclusive contractual relationships of those manufacturers' representatives.

82.     Intentionally interfering, threatening, or coercing these relationships harms not only the immediate business relationship but if repeated will destroy the trust, framework, foundation, and business culture that exists worldwide.

83.     Similarly, if any entity, be it government, non-profit, or for-profit, in its acquisition of real estate, establishes a precedent or pattern of "cutting out" or eliminating real estate listing brokers through coercive or deceptive measures to obtain better terms or prices, the rights and the roles of brokers will be challenged, again potentially altering the trust, framework, foundation and business culture that exists for the millions of real estate brokers.

84.     The LDS Church breached the established industry customs and standards, as described herein.

## FIRST CAUSE OF ACTION
### (Intentional Interference with Economic Relations)

85.     Plaintiffs hereby incorporate all preceding paragraphs as if those paragraphs were expressly set forth herein.

86.     The LDS Church intentionally interfered with the Representation Agreements between Giemme and Astanza by telling representatives of Giemme that the LDS Church would no longer buy from Giemme unless Giemme breached its contract with Astanza and dealt directly with the LDS Church and no longer used Astanza as its representative with the LDS Church.

87.     The LDS Church's intentional interference was undertaken through improper means.  The LDS Church economically coerced, threatened, and forced Giemme to sign the

Letter Agreement by stating that the LDS Church would no longer do business with Giemme unless it signed the Letter Agreement and cut Astanza out as the exclusive, worldwide manufacturer's representative.

88.     The Letter Agreement, which was the culmination of a campaign to coerce Giemme into breaching its Representation Agreement with Astanza, forced Giemme to breach the Representation Agreement because it forbade Giemme from using sales representatives such as Astanza.

89.     The LDS Church made this demand despite knowing that the Representation Agreement existed between Giemme and Astanza that designated Astanza as the exclusive, worldwide sales firm for all Francesco Molon products and services sold or distributed to the LDS Church and required all communication and orders to go through Astanza.

90.     For at least one temple, the LDS Church ordered directly from Giemme using an entity name with German address that the LDS Church had never used when purchasing Francesco Molon furniture through Astanza, denying Astanza of the commissions it was due under the Representation Agreement.

91.     The LDS Church's predatory and coercive means of forcing Giemme to break its Representation Agreement with Astanza also constitutes an additional improper means because its actions violate the established standard of a trade or profession with respect to third parties that exclusively represent a manufacturer to a buyer.

92.     The LDS Church's coercive efforts to eliminate Astanza as Giemme's representative, without compensating Astanza for the valuable service it provided to the LDS Church as Giemme's representative, violates the established standard for the trade or profession.

93.     The LDS Church intentionally interfered with the Supplier/Reseller Agreement between Caoba de Honduras and Astanza by expressing and promoting a policy against Mr. Sweet that encouraged its Design Agents to deal direct with Caoba de Honduras effectively forcing a breach and ultimately the termination of the Caoba de Honduras contract with Astanza.

94.     The LDS Church's intentional interference was undertaken through improper means.  The LDS Church economically coerced, threatened, and forced Caoba de Honduras to break its Supplier/Reseller Agreement with Astanza.

95.     The LDS Church made this demand despite knowing that the Supplier/Reseller Agreement existed between Caoba de Honduras and Astanza that designated Astanza as the exclusive, worldwide sales firm for all Caoba de Honduras' products and services sold or distributed to the LDS Church and required all communication and orders to go through Astanza.

96.     For at least one temple, the LDS Church ordered directly from Caoba de Honduras, resulting in Astanza losing the commission of approximately $15,000 that it was due under the Supplier/Reseller Agreement.

97.     The LDS Church's predatory and coercive means of forcing Caoba de Honduras to break its Supplier/Reseller Agreement with Astanza also constitutes an additional improper means because its actions violate the established standard of a trade or profession with respect to third parties that exclusively represent a manufacturer to a buyer.

98.     The LDS Church's coercive efforts to eliminate Astanza as Caoba de Honduras's representative, without compensating Astanza for the valuable service it provided to the LDS Church as Caoba de Honduras's representative, violates the established standard for the trade or profession.

99.     As a result of the LDS Church's actions, Astanza and Mr. Sweet have been damaged in excess of $75,000.00, exclusive of interest and costs.

## SECOND CAUSE OF ACTION
### (Unjust Enrichment and/or Quantum Meruit)

100.     Plaintiffs hereby incorporate all preceding paragraphs as if those paragraphs were expressly set forth herein.

101.     By introducing the LDS Church to Giemme, a furniture manufacturer previously unknown to the LDS Church, the Plaintiffs conferred a substantial benefit to the LDS Church.

102.     The Plaintiffs also conferred a substantial benefit to the LDS Church by coordinating the efforts of key representatives of the LDS Church involved in designing and furnishing its temples with key representatives of Giemme involved in designing its furniture and fulfilling orders.

103.     The Plaintiffs expended substantial resources to develop their contacts in the LDS Church and Giemme, and in developing a system to facilitate and coordinate the process of quotes, designing custom furniture, coordinating purchase orders, delivering products, and following up with warranty issues.  Mr. Sweet and Astanza coordinated all of these activities and more.

104.    By introducing the LDS Church to Caoba de Honduras, a furniture manufacturer previously unknown to the LDS Church, the Plaintiffs conferred a substantial benefit to the LDS Church.

105.    The Plaintiffs also conferred a substantial benefit to the LDS Church by coordinating the efforts of key representatives of the LDS Church involved in designing and furnishing its temples with key representatives of Caoba de Honduras involved in designing its furniture and fulfilling orders.

106.    The Plaintiffs expended substantial resources to develop their contacts in the LDS Church and Caoba de Honduras, and in developing a system to facilitate and coordinate the process of quotes, designing custom furniture, coordinating purchase orders, delivering products, and following up with warranty issues.  Mr. Sweet and Astanza coordinated all of these activities and more.

107.    The LDS Church was aware of these substantial benefits that the Plaintiffs provided to the Church.

108.    It would be unreasonable, unjust, and inequitable to allow the LDS Church to retain the benefits that the Plaintiffs conferred on it without paying the Plaintiffs the reasonable value for their services.

109.    As a result of the LDS Church's actions, Astanza and Mr. Sweet have been damaged in excess of $75,000.00, exclusive of interest and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter judgment in the Plaintiffs' favor as follows:

1.     On Plaintiffs' First Cause of Action, for a judgment against the LDS Church, for damages in an amount to be determined at trial, for pre and post judgment interest, for costs, and for all further relief the Court deems proper.

2.     On Plaintiffs' Second Cause of Action, for a judgment against the LDS Church, for damages in an amount to be determined at trial, for pre and post judgment interest, for costs, and for all further relief the Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby make a demand for a trial by jury on all issues triable as a matter of right by a jury as provided by the FEDERAL RULES OF CIVIL PROCEDURE.

DATED this 17th day of March, 2016.

WRONA LAW FIRM, P.C.


/s/ Scott A. DuBois
Scott A. DuBois
Joseph M. Stultz
*Attorneys for Plaintiffs*